UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No: 3:18CR297(JCH) |
| v. | : | |
| LONNIE JOYNER | : | APRIL 20, 2022 |

### DEFENDANT'S SENTENCING MEMORANDUM

Defendant, Lonnie Joyner, by and through counsel, submits this memorandum to aid the Court with imposing a sentence that is "sufficient, but not greater than necessary" to achieve the statutory sentencing purposes. For the reasons set forth below, Mr. Joyner submits that he has an offense level of 23 with a corresponding guideline range of 92-115 months.

### I. INTRODUCTION

**A. Procedural**

On March 21, 2019, Mr. Joyner appeared in Court before the Honorable Robert M. Spector for his initial appearance following his federal arrest. On June 27, 2019, Mr. Joyner appeared in the United States District Court at New Haven, Connecticut, before the Honorable Janet C. Hall, United States District Judge. On that date, Mr. Joyner entered a guilty plea to Count One of the single-count Indictment.[1] The Government moved for detention and counsel for Mr. Joyner consented without prejudice to reapplication should circumstances change. On November 6, 2019, Mr. Joyner appeared in Court before the Honorable Janet C. Hall, United States District Judge, for a detention hearing. He was released by the Court to reside with his girlfriend, Catalina Beltre, at 101 Windsor Avenue in Meriden, Connecticut. Ms. Beltre agreed to act as a third-party custodian and the Court ordered additional pretrial conditions. PSR, p.4. ¶ 5. On May 4, 2020, the Court approved the removal of the home confinement condition. On May 11, 2021, Mr. Joyner

---

[1] PSR, p.4. ¶ 1. 18 U.S.C. §§ 922(g)(1), 924(a)(2)

was arrested, and was subsequently presented before the Honorable Robert M. Spector for an initial appearance on a violation of pretrial supervision warrant. On June 4, 2021, Mr. Joyner entered into a written plea agreement with the Government and pleaded guilty before this Court.

**B. Offense Conduct**

A joint investigation between the Connecticut and Maine United States Attorney's Offices was conducted in April 2016. It was learned from two defendants that for the past eighteen months, a group known as the "Waterbury Group" had been driving back and forth from Waterbury to Maine bringing heroin in 100-gram quantities on each trip with them to Maine. It is alleged that the members of the group would stay with the defendants in their home; in exchange, the defendants received heroin at a lower price. The Waterbury group would sell heroin to numerous persons in east or northeast Maine from the defendants' home and return to Waterbury two to three times per week with money and guns procured from the sale of heroin. PSR, p. 7. ¶ 19. CD-3 stated that Mr. Joyner transported narcotics from Waterbury to Dedham, Maine.

Furthermore, the State of Maine DEA Detective introduced a DEA agent in Connecticut to her confidential informant (CI) who also had previous dealings with Mr. Joyner and worked with CD-3. The CI told the Connecticut DEA agent that Mr. Joyner would take the money in which he obtained from dealing narcotics in Maine and transport the money to a storage facility that he rented in Waterbury off of Thomaston Avenue. PSR, p. 8. ¶ 23. On September 26, 2017, the Connecticut DEA located a storage facility. The storage facility consisted of Cube Smart Storage Store, located at the intersection of Thomaston Avenue and West Main Street in Waterbury. Following this discovery, an administrative subpoena on Cube Smart was served and it was determined that Mr. Joyner rented the storage unit number 302 on August 14, 2017. It was also determined that Mr. Joyner paid cash for rent through December of 2017. PSR, p. 8. ¶ 24.

On September 27, 2017, a search warrant was obtained for Cube Smart. A search upon unit number 302 revealed a 2011 Honda Crosstour. Inside the vehicle, observed from the window, remained a boot with a gun sticking out of it. The DEA then obtained a search warrant for the vehicle, where they found two

2

firearms, paperwork for Mr. Joyner, gold earrings, and a Rolex watch. The recovered firearms included a Harrington and Richardson model 925, .38 caliber revolver, bearing serial number AF42853. A firearm eTrace revealed that it was originally sold in Detroit, Michigan at a Kmart. The second firearm was a Smith & Wesson model 60, .38 caliber revolver, bearing serial number R34102. A firearm eTrace showed that the original dealer of the firearm was located in Greenfield, Massachusetts. PSR, p. 8. ¶ 25.

**II.     OBJECTIONS TO THE PRESENTENCE REPORT AND ITS U.S.S.G. CALCULATIONS**

Mr. Joyner objects to several aspects of the presentence report, which pertain to the U.S. Sentence Guidelines calculations by U.S. Probation and the Government in its Sentencing Memorandum. Mr. Joyner contends that his guideline calculation should not include and enhancements for obstruction of justice and that this honorable Court that find Mr. Joyner has truthfully admitted his criminal activity and award him the two-point reduction for acceptance of responsibility.

**A. Adjustment For Acceptance of Responsibility**

The Government and Probation urge the court to deny Mr. Joyner of the two-level acceptance of responsibility reduction, pursuant to USSG §3E1.1, which states that "conduct resulting in an enhancement under §3C1.1 (Obstruction) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. The Government cites the fact that Mr. Joyner absconded, and the new criminal charges lodged against him by the Meriden Police Department as reasons to not reward his acceptance of responsibility.

Sentencing Guideline § 3C1.1, provides that, if the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels. *United States v. Case, 180 F.3d 464, 467 (2d Cir. 1999).* Contrary to the Government's assertion, Mr. Joyner truthfully admitted the conduct comprising the offense(s) of conviction as required by §1B1.3. As such, the Defendant urges this Court to award Mr. Joyner the 2 points for acceptance of responsibility.

### B. Adjustment for Obstruction of Justice

The Government and PSR encourage a two-point enhancement as Mr. Joyner absconded from justice. Only the Government urges an additional two-point enhancement for alleged threats made against his probation officer. Mr. Joyner submits that neither of these incidents warrant an two-point enhancement and that this Court could adjust for this behavior within the current guideline range as calculated herein.

The Guidelines provide that the sentencing court should increase a defendant's offense level "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." Guidelines § 3C1.1. Among the types of behavior that can warrant an obstruction-of-justice enhancement are "willfully failing to appear, as ordered, for a judicial proceeding," Guidelines § 3C1.1, Application Note 3(e); see also *United States v. Aponte*, 31 F.3d 86, 88 (2d Cir.1994), or "[f]light from pretrial services between conviction and sentencing," *United States v. Defeo*, 36 F.3d 272, 276 (2d Cir.1994), or deliberately changing residence in order to avoid detection of unlawful activity while on release prior to sentencing, see id. at 276-77. Whatever circumstances are alleged to constitute obstruction in a particular case, an enhancement under § 3C1.1 is not appropriate, by the terms of that section, unless the obstruction was "willful [ ]." We have observed that the term "willfully" implies a mens rea requirement, see, e.g., *United States v. Stroud*, 893 F.2d 504, 507 (2d Cir.1990). Thus, such an adjustment is appropriate only if "the defendant had the specific intent to obstruct justice, i.e., ... the defendant consciously acted with the purpose of obstructing justice." *United States v. Defeo*, 36 F.3d at 276 (internal quotes omitted); see also U*nited States v. Bonds*, 933 F.2d 152, 154 (2d Cir.1991) (per curiam) (deliberate change in appearance could not be the basis of a § 3C1.1 enhancement where evidence did not establish that it was done with the purpose of obstructing investigation); *United States v. Stroud*, 893 F.2d at 507 (flight from arrest in immediate aftermath of a crime cannot by itself justify enhancement under § 3C1.1).

#### i. Absconding

While there is no doubt Mr. Joyner absconded from justice for a brief period, Mr. Joyner submits that this conduct can be accounted for within the guideline range and request this Court to not award the

enhancement. Mr. Joyner now realizes that he made a big mistake but wants the Court to know he was suffering a great deal from the passing of his sister, and not thinking clearly. Mr. Joyner apologizes for this behavior and asks this Court for forgiveness.

### ii. Threatening Probation Officer

These allegations also occurred during an extremely difficult time as he was dealing with the passing of his sister. As previously noted, this tragedy had a profound effect on Mr. Joyner's mental and emotional state. Although this is not an excuse for this behavior but at least there's somewhat of an explanation as to why he was behaving that way.

This conduct concerned an incident that occurred on December 4, 2020, when an altercation between Mr. Joyner and his girlfriend's mother occurred. Mr. Joyner was not charged for this conduct and the alleged victims chose not to press charges. However, a violation report was submitted to the court based on this incident. On December 10, 2020, a warrant was issued by the court for Mr. Joyner's arrest. On December 14, 2010, Mr. Joyner's supervision officer received a phone call from Mr. Joyner, where he asked about the pending warrant and the details surrounding it. The officer directed Mr. Joyner to report to the court to discuss further, where Mr. Joyner expressed his displeasure with the noted circumstances. After the phone call ended, Mr. Joyner left two voicemail messages via text message where he further and explicitly expressed his displeasure.

Again, Mr. Joyner's comments are certainly upsetting but, again, his sister had just passed away and does not reflect Mr. Joyner's true character and was under extreme emotional distress.

### III. GUIDELINES CALCULATION

**A. Fernandez Departure**

It is clear here that probation has calculated Mr. Joyner's guidelines to be much higher than contemplated in the plea agreement. *See PSR, p. 35. ¶ 115.* In the plea agreement entered into by Mr. Joyner, the parties had calculated a total offense level of 19 and a criminal history VI. The party's total offense level was arrived at after consideration of a base offense level of 14, the addition of 4 levels for trafficking of firearms, in addition of 4 levels for possession of a firearm in connection with another felony

5

offense, and a 2-level reduction for acceptance of responsibility. Mr. Joyner pled guilty, relying on this agreement that was reached between both parties. Mr. Joyner, after pleading guilty, believed that his guidelines would be calculated lower than 120 months. The Government, in its Sentencing Memorandum, does not object to a limited Fernandez departure. The Government does however suggest a variety of sentencing enhancement for the Court's consideration for behavior that took place after the plea was entered.

The Court should depart down to the guidelines contemplated in the plea agreement, should this court disagree with the undersigned and the government, reaching the conclusion that Mr. Joyner's range is 63 months to 78 months. The Government should depart because a plea agreement, although not binding on the Court, should be honored for various policy reasons. *United States v. Fernandez*, 877 F.2d 1138 2d Cir.(1989). Mr. Joyner was consistently advised by his attorney to accept his plea of guilty. Mr. Joyner was constantly advised that his criminal history category would be VI, with a base offense level of 19. The Second Circuit has consistently given great weight to guideline computations in plea agreements that are reached between the Defendant and the Government. It has recognized that the Government has "unique expertise at muddling through the complexities of the guidelines…" *United States v. Pimental*, 932 f.2d 1029 2d.Cir (1991). Mr. Joyner was made aware of the plea agreement that was reached between both parties, for which he accepted his plea of guilty. This Court should follow the lead of the other district courts in this Circuit and sentence the Defendant to the agreed upon guideline range that was arrived at in the plea agreement.

**B. Factors to be Considered in Imposing a Sentence**

A District court may not presume that a Guideline sentence is reasonable, it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense. District Judges are, as a result, generally free to impose sentences outside recommended range. *Id*. Once again, District Judges may exercise discretion in fitting sentences to a defendant's individual characteristics. *United States v. Crosby*, 397 F.3d 103, 114 (2d Cir. 2005).

In accordance with the United States Code, 18 § 3553(a), the court is directed to consider several factors to impose a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing. Title 18 provides the framework and factors to be considered by the sentencing judge in determining the particular sentence to be imposed. The court is directed to consider the history and characteristics of each individual defendant in order to impose a sentence which reflects the seriousness of the offense, promotes respect for the law, and provides just punishment. An analysis of the § 3553(a) sentencing factors makes clear that a Guidelines sentence would be greater than necessary to achieve the goals of sentencing in Mr. Joyner's case.

**1. 18 U.S.C. § 3553(a)(1): Nature, Circumstances and History of the Defendant**

Mr. Joyner was born on July 10, 1984, in Manhattan, New York. Mr. Joyner's father was Lewis Joyner, and his mother was Beverly Joyner, where they were legally married and resided in Waterbury since 2011. Beverly Joyner still works as a certified nursing assistant and is physically healthy, despite her addiction to PCP that surrounded Mr. Joyner during his youth. When looking at Mr. Joyner's PSR, it is easy for one to formulate their own opinion as to classifying Mr. Joyner as a violent person. However, it is important to understand that witnessing such violence as a youth leaves an almost everlasting impact. Mr. Joyner reported that "he couldn't stand" his dad growing up due to his alcoholism and physical abuse of his mother. Mr. Joyner recalls a specific instance, of when he was five or six years old, where his father had stabbed his mother during an argument. Mr. Joyner said he witnessed the continuous abuse by his father, who now has several health issues which include lung cancer, heart problems and diabetes.

Although Mr. Joyner recalls that these events of abuse had stopped when he was about 15 or 16 years old, case studies have shown that these traumatic events leave an everlasting impact. According to a recent case study, *Effects of Adolescent Physical Abuse, Exposure to Neighborhood Violence, and Witnessing Parental Violence on Adult Socioeconomic Status*, research on the effects of adolescent physical abuse, witnessing domestic violence, and perceptions of community violence have generally, with few exceptions, found them to be predictive of subsequent negative behavioral outcomes, such as substance

7

abuse, crime, and other problem behaviors.[2] In response to the stabbing, the New York Office of Children and Family Services took custody of Mr. Joyner and his siblings. Mr. Joyner was separated from his siblings, except for his sister, Keiah Joyner, where they were assigned to live with a Jamaican family. PSR, p. 26. ¶ 70. Mr. Joyner recalled that this foster family would often beat him and his sister, Keiah, if they refused to eat certain foods or when he was intoxicated. Mr. Joyner mentioned that the police were often called to their home. It is estimated that Mr. Joyner was assigned to live with foster families between two to three years.

Trauma has followed Mr. Joyner throughout his life. Mr. Joyner was exposed to other significant traumatic events, aside from the ones in which he experienced at home and with his foster family. When Mr. Joyner was only 14 years old, he and his best friend Chris Tyson, were playing basketball in West Haven, when a fight broke out between Tyson and another individual. Once West Haven Police responded, Tyson attempted to run away from the police and in the process was struck by a truck, where he was killed instantly. For Mr. Joyner, the value of friendship in a troublesome life such as his own, was very crucial. Mr. Joyner experienced more trauma when his paternal uncles died in 2015 or 2017, for Mr. Joyner was reported to be very close with them.

It is obvious that Mr. Joyner is no stranger to our criminal justice system. For Mr. Joyner is "tired of jail - older now." PSR, p. 30. ¶ 85. Mr. Joyner has realized that time is life's most valuable and irreplaceable commodity, for he realized that he has lost time with his family, his children, and women in his life. Mr. Joyner has four biological siblings, a brother, Dashawn Joyner 21, who lives in Waterbury, Connecticut with their mother and works as a medical assistant; a sister, Keiah Joyner, 34, who lives in New Haven and works as a CNA; a sister, Lonneka Joyner, 26 or 27, who lives in Mexico and works as a CNA; and another sister, Sharese Joyner, 24 or 25, who lives in Waterbury and also works as a CNA. Mr. Joyner had a fourth sister, Latisha Joyner, who died unexpectedly on July 26, 2020, from complications

---

[2] Covey, Herbert C., et al. "Effects of Adolescent Physical Abuse, Exposure to Neighborhood Violence, and Witnessing Parental Violence on Adult Socioeconomic Status." Child Maltreatment, vol. 18, no. 2, 2013, pp. 85–97., https://doi.org/10.1177/1077559513477914.

that arose after a gastric bypass surgery. Mr. Joyner has reported that the tragedy of his sister's death still remains prevalent among his family, for Mr. Joyner was especially close with Latisha. Mr. Joyner had two maternal half-brothers; Tyrone Lindsy 44, and Ronnell Lindsy, 40. Their father is Tyrone Lindsy, who Mr. Joyner said he had a relationship with when he was younger.

Despite the violent and tragic upbringing, Mr. Joyner is reported to have a good relationship with his father now. Despite the violent acts, commenced by his father, which robbed Mr. Joyner of his innocent childhood, Mr. Joyner maintains a good relationship with his father to this day. This act of forgiveness displays that Mr. Joyner understands the value of family. Prior to his mother regaining custody of her children, Mr. Joyner and his siblings lived for a short time with Constance Blunt, the mother of Tyrone Lindsay, the father of Mr. Joyner's half-brothers. Around the age of ten, Mr. Joyner and his family moved to West Haven, Connecticut. Mr. Joyner started to spend time "on the streets in New Haven" around the age of 16 or 17. It was not long before Mr. Joyner felt the effects of the environment he now existed in, for in October of 2002, he was shot at the age of 17 years old. On that day Mr. Joyner was shot in the left arm and in the chest. PSR, p. 28. ¶ 74. Mr. Joyner reported family financial struggles due to his father being in and out of jail. As a result, Mr. Joyner's mother eventually had to sell the house they owned in West Haven.

As mentioned previously, Mr. Joyner is exhausted with his series of incarceration, and is ready to "get this case out of the way and go home to be a man this time." PSR, p. 30. ¶ 87. Mr. Joyner recalls that the happiest moment in life was when his first child, Lonnay Joyner, was born. As the court will see, being a father is something that Mr. Joyner values deeply. Mr. Joyner married Catalina Jessie Beltre in 2019. They share two children, Josan Joyner, 2, and Dream Joyner, 10 months. In 2015, Mr. Joyner married Melanie Joyner and they divorced in 2018. Together, they had a son, Lonnie Joyner V, 5, who resides with Melanie in Waterbury. Mr. Joyner had several other children born out of wedlock with different women, resulting in five children. The Government asserts that it is unlikely that Mr. Joyner is a necessary part in his children's lives, however this could not be further from the truth. *See* Gov. Mem pg. 20. ¶ 2. Today, all of Mr. Joyner's children are healthy, for none of them have any medical, emotional, mental health, or

developmental and/ or learning issues. PSR, p. 28. ¶ 76. Ms. Beltre, who remains a prominent figure in Mr. Joyner's life, said that he loves his kids and his family.

### 2. 18 U.S.C. § 3553(a)(2): Need for Sentence Imposed to Reflect Seriousness of the Offense and Promote Deterrence

There is no doubt Mr. Joyner's behavior that led him to this current situation is extremely serious. Firearms and narcotics are a plague to cities around the country with Waterbury being no exception. Waterbury residents suffer greatly due to the impact of violence and drugs in the city and Mr. Joyner contributed to that and this Court needs to impose a period of incarceration commensurate with Mr. Joyner's behavior. Mr. Joyner was bringing guns into Waterbury from out of state and had a hand in bringing heroin to a susceptible community. That being said, Mr. Joyner stands before this court today accepting responsibility, not rejecting it. Mr. Joyner is here today, ready to pay for his actions and move on with his life, so that he can become a prominent figure in his children's and grandchildren's lives. Mr. Joyner remains focused on his future goals in obtaining a CDL, and eventually to own a trucking business. PSR, p. 30. ¶ 85. Given all of the facts and circumstances that this Court is aware of, the imposition of a sentence to achieve the statutory sentencing purposes of 63 to 78 months -would be sufficient to achieve the required specific deterrent effect.

### C. SUGGESTED POST PLEA GUIDELINE ENHANCEMENTS

The pre-sentence report and the Government's Sentencing Memorandum detail several sentencing enhancements they believe should apply to Mr. Joyner and his objections are noted below.

The Government and PSR suggest a six-point enhancement under U.S.S.G. § 2k2.1(b)(1)(C) because they believe Mr. Joyner had 25-29 guns trafficked. This enhancement is based on statement provided from other defendants in another District and do not bear the requisite sufficient indicia and reliability to support its probable accuracy. No doubt were other defendants involved in this scheme shifting the blame from themselves to Mr. Joyner. Mr. Joyner stands by his prior comments that he was only involved with the transportation of two guns and had adamantly denies any type of larger role. While it may be true that many guns were trafficked between Maine and Waterbury, there is not sufficient evidence

that this amount was reasonably foreseeable to Mr. Joyner or that he had any knowledge of it whatsoever. As a result, the 6-point enhancement for trafficking between 25-29 guns should not be awarded by this Court.

Mr. Joyner does not object to 4-point enhancement under U.S.S.G. § 2k2.1(b)(5): that he possessed firearms while trafficking firearms. "Where defendant has received two or more firearms with the intent to transport, transfer or otherwise dispose of firearms to another individual." Mr. Joyner admits that he transported more than one firearm to sell in Connecticut and this enhancement is reflected in the Plea Agreement.

Similarly, the Defendant does not object to the 4 points added under U.S.S.G. § 2k2.1(b)(6)(B): that "Joyner possessed firearms in connection with another felony offense, the possession and distribution of heroin," as that was also contemplated and agreed on in the plea agreement.

As requested by the Government, Mr. Joyner hereby stipulates that a 4-point enhancement is warranted, as Mr. Joyner admits he trafficked a firearm to a person "whose possession or receipt of the firearms would be unlawful" to satisfy that requirement.

As previously discussed, Mr. Joyner objects to enhancements under U.S.S.G. § 3C1.1 that he absconded from justice after entrance of his guilty plea. Similarly, Mr. Joyner objects to the two-point enhancement for alleged threats made to Probation Officer Vargas.

**D. UPWARD DEPARTURE**

The Government contends that an upward departure is warranted under U.S.S.G. § 4A1.3(a) which reads "reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, an upward departure may be warranted. Mr. Joyner's criminal history although substantial, is not under-stated. Criminal History VI is the highest category which has a significant impact on his guideline range and sufficiently accounts for his criminal history without warranting an upward departure.

### E. DOWNWARD DEPARTURE

Mr. Joyner submits that if the Court is inclined to adopt Probation's Guideline Calculation or even the Government's Guideline Calculation that it then depart downward to the guideline range originally contemplated in the plea agreement plus the four levels under the stipulation to arrive at a level 23 with a corresponding guideline range of 92-115 months.

### III.     CONCLUSION

Mr. Joyner stands before this Court facing a suggested level 23, with a criminal history category of VI, which results in a guideline range of 92-115 months. Mr. Joyner's childhood was polluted by violence, drug addiction, family substance use disorder, and relentless crime. Mr. Joyner is ready to turn to the next chapter in his life and leave the past where it belongs, as he accepts his plea of guilty. The Defendant respectfully requests that this Court impose a sentence that is "sufficient, but not greater than necessary" to achieve the statutory sentencing purposes.

Respectfully submitted,

THE DEFENDANT,
LONNIE JOYNER


　/s/　29823_____
Daniel Thibodeau
Minnella, Tramuta & Edwards, LLC
40 Middlebury Rd, Middlebury, CT 06762
(203) 647-7872 (phone)
(203) 283-5598 (fax)
DThibodeau@mtelawfirm.com
Federal Bar No. 2982

## **CERTIFICATE OF SERVICE**

       I hereby certify that the foregoing motion was filed electronically and sent by first-class mail, postage prepaid, on this 20th day of April 2022, to anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system, or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

                                                /s/   Daniel Thibodeau_____
                                                Daniel Thibodeau